ALSD Local 106 (Rev. 07/13) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Alabama

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| 2507 Richard Avenue, Mobile AL 36606 | ) ) ) |

Case No. MJ 18-0141-B

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

2507 Richard Avenue, Mobile AL 36606, more particularly described in Attachment A

located in the _____Southern_____ District of _____Alabama_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 1030(a)(2)(C) | Unauthorized access of protected computer |

The application is based on these facts:

See attached Affidavit, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI Task Force Officer Stephanie Cassidy

*Printed name and title*

Sworn to before me and attestation acknowledged pursuant to FRCP 4.1(b)(2).

Date: 11/14/2018

*Judge's signature*

City and state: Mobile, Alabama

Sonja F. Bivins, United States Magistrate Judge

*Printed name and title*



Certified to be a true and correct copy of the original.
Charles R. Diard, Jr.
U.S. District Court
Southern District of Alabama
By Maria Payne
Deputy Clerk
Date November 14, 2018

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Stephanie Cassidy, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Florida Department of Law Enforcement (FDLE), and have been so employed since August 25, 2017.  Your Affiant is currently assigned to the Cyber/High-Tech Crime Squad of FDLE's Pensacola Regional Operations Center. Your Affiant's primary responsibilities consist of investigating crimes involving computers and the internet, including internet crimes against children and network intrusions. Your Affiant is also the Network Intrusion FBI Task Force Officer for the Florida Panhandle region and has been assigned to that role since May 1, 2018.  Your Affiant also has almost seven (7) years of sworn law enforcement experience at the Escambia County Sheriff's Office in Florida. Your affiant has participated in the execution of numerous search warrants, including search warrants relating to computer crimes such as internet crimes against children, cyber intrusions, and fraud. Your Affiant has received official training concerning computer skills and internet investigations through CompTIA, the United States Navy (USN), the Department of Homeland Security (DHS), the United States Secret Service (USSS), the Federal Bureau of Investigation (FBI) and the National White Collar Crime Center (NW3C), and possesses extensive computer skills for law enforcement purposes.  Your Affiant is familiar with the methods employed by persons involved in the commission of cyber offenses.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1030(a)(2)(C) have been committed by Timothy Jerome Smith and that evidence will be located at the subject premises (**2507 Richard Avenue, Mobile, Alabama 36606**). There is probable cause to search the premises described in Attachment A for evidence and instrumentalities of these crimes, as described in Attachment B.

## PROBABLE CAUSE

4.      On July 10, 2018, the Escambia County Sheriff's Office (ECSO) in Florida contacted the FDLE Pensacola Regional Operations Center for assistance with an investigation. Your Affiant met with ECSO Investigator Frank Higginbotham, who relayed information about a network intrusion investigation involving a company in Pensacola, Florida, and a suspect in Mobile, Alabama. Due to jurisdictional issues, Investigator Higginbotham requested that your Affiant take over the investigation. The following was revealed to your Affiant.

a. On May 9, 2018, the owners of a company in Pensacola, Strike Lines, LLC, were notified by an acquaintance that someone with the online name "Timothy Smith" was claiming that he accessed all of the company's mapped fishing coordinates the company sells regarding areas believed to be successful fishing spots in or around the Gulf of Mexico. The owners of Strike Lines stated they do not know Smith, and that he does not work for the company nor has authorization to access their fishing coordinates/intellectual property via their protected website. Smith apparently advised

2

others online that he had over ten thousand (10,000) coordinates belonging to Strike Lines, and stated that he accessed them through ███████████ website. Strike Lines estimated the value of the coordinates stolen to be in excess of $300,000. On May 14, 2018, the owners of Strike Lines were able to speak to Smith via cellular telephone, and he stated that he could access all of the company's private fishing spots via the website and he sent screenshots to prove it. See below.



b.  As a background, Strike Lines uses commercial side sonar to map the floor of the Gulf of Mexico in order to mark fishing spots that they, in turn, sell as coordinates to interested parties for $190 each. The website keeps track of all the spots sold and those still for sale. The company also uses sonar capability and sonar from public sources (the National Oceanic and Atmospheric Administration, for example) to create fishing charts. They go through the charts and data and mark the good spots, trace out ledges, circle hard bottom areas and then create fishing charts for Garmin, Simrad,

3

Humminbird, and other fish finders. Those charts are sold for $199 each through the website.

c. On June 19, 2018, Timothy Smith of Mobile, Alabama, posted on his personal Facebook page, ███████████████, and on two Facebook Group pages ("Pensacola Fishing Fanatics" and "The Alabama Fleet"), that he was in possession of the coordinates. See below.



4



d.  Multiple customers of Strike Lines contacted the owners of the company to advise them of these postings. Some of the customers even communicated with Smith via Facebook Messenger, and Smith advised them of how many coordinates he had from the

company and also sent screenshots of his laptop containing the data of the coordinates to prove that he was in such possession.  See below examples.





e.   On June 20, 2018, the owner of Strike Lines contacted Smith via text message. Smith stated that he could still access the website (the company's website developer added

security steps in response to the first communication in order to stop unauthorized access into the website/company), and that the company's website developer did not properly fix the vulnerabilities. In order to prove that he could still access their website, he texted a picture of the data he was accessing to the owner. Smith would not say how he was gaining access to the website and/or servers. See below.



f.  During the texts, Strike Lines advised Smith that the coordinates were property of the company and Smith needed to stop accessing the website and remove the posts from social media. Smith first proposed that the owners hire him to fix their website and then switched to trying to bargain with the owner of the company. Smith stated that he would remove the posts and help the company for free if the owners provided him with coordinates that pertained to good "deep drop spots for Grouper" as well as never tell anyone about the incident. At first, the owners agreed so that Smith would stop harassing the company, but Smith became angry because Strike Lines did not give him

7

the information he requested fast enough, he stated the "deal was off," and he was going

to keep the posts up and he no longer wanted to speak with them.  See below.









g.  On July 12, 2018, your Affiant viewed Timothy Smith's Facebook page, which was under the name "Timothy Smith" and had a ███████████████████████ Your Affiant viewed a public post on Smith's Facebook page made on July 9, 2018, stating that he was going to be deleting his Facebook account. Due to your Affiant having knowledge that evidence of the crime in this case was present on Smith's account profile and Facebook Messenger, a preservation request was sent to Facebook. An email response from Facebook was received stating the request was processed and the preservation was valid for ninety (90) days.  Based upon the above, your Affiant believed evidence would be located within Timothy Smith's Facebook account, ██████████████████ in that Smith utilized said account during the commission and aftermath of violations of Title 18, United States Code, Section 1030(a)(2)(C).

10

5.      On July 20, 2018, your Affiant spoke with Ralph Haynes, Owner/Lead Developer of Hail Studio Web Development. Haynes confirmed that he is the website developer of the Strike Lines website and he also maintains the website. He stated that he was advised of Timothy Smith's unauthorized access of the website database, and so he added additional security in response. He further stated that he was advised thereafter that Smith was still able to gain access to the website's database.  Your Affiant requested the server logs for Strike Lines from May 1, 2018, through June 30, 2018, as that was the time frame Timothy Smith gained unauthorized access to the company's website information. On July 20, 2018, Haynes provided the server logs  to your Affiant.

6.      On July 23, 2018, a grand jury subpoena was issued for Verizon Wireless cell phone ████████████████. This cell phone number is associated with Timothy Smith and was used to contact the owners of Strike Lines.

7.      On July 27, 2018, United States Magistrate Judge Elizabeth M. Timothy of the Northern District of Florida authorized a search warrant for Facebook account ████████████████████ On August 16, 2018, your Affiant received the search warrant results from Facebook. Facebook provided the requested contents of Facebook account ████████████████████ belonging to Timothy Smith. The contents consisted of two thousand one hundred seventy nine (2,179) pages as well as a Certificate of Authenticity. Facebook provided the following general information for the owner/subscriber  of ████████████████:

Name: Timothy Smith

████████████████████████████████████████████



The following Internet Protocol (IP) addresses were utilized to access Timothy Smith's Facebook account: ███████████████████████████ and ████████████ Timothy Smith's Facebook account searched for the victim business, Strike Lines, on Facebook twenty three (23) times between May 1, 2018, and July 11, 2018.[1]

8.    Facebook also provided Timothy Smith's Facebook Messenger conversations. Your Affiant located numerous conversations wherein Smith communicated about being in possession of the Strike Lines' master fishing spot list. A sample of the conversations are as follows:



---

[1] Smith stated in a Facebook conversation that he obtained the Strike Lines master coordinate list and sales data through a program he identified as "Fiddler." Fiddler is a Web Debugging Proxy platform that monitors and modifies web traffic. This freeware tool enables developers, testers, and enthusiasts to inspect traffic, set breakpoints, and "fiddle" with incoming or outgoing data. Fiddler sits between the http client and http server listening on a port for traffic. It enables a proxy between two layers to intercept the traffic, the request being taken does not proceed to the server directly, instead, it is sent to Fiddler proxy bridge, Fiddler records the incoming and outgoing data and then forward to server again. The tool enables you to inspect incoming and outgoing data to monitor and modify requests and responses before the browser receives them. With these tools, you can create offline images of the browsing experience and then package and analyze the results to obtain more detailed information. This tool is intended for use by companies or website owners to monitor their own traffic, however, it can be used maliciously on websites to obtain sales data information and JavaScript Object Notation (JSON). The information that is obtained maliciously is not readily available and is obtained through vulnerabilities and then pieced together.



13



14





16



17



18



19



20







23



24



25





27





29











34



35





37



9.      Your Affiant searched Strike Lines' server logs for any Internet Protocol (IP) addresses that were also utilized to log into Timothy Smith's Facebook account.[2] The following IP addresses were located in the May logs as accessing the Strike Lines' website on the following dates:

███████████████████

May 9, 2018

(Accessed website a total of ten (10) times)

████████████████

April 30, 2018

May 3, 2018

May 7, 2018

May 8, 2018

May 9, 2018

May 10, 2018

May 11, 2018

May 12, 2018

May 13, 2018

May 14, 2018

May 16, 2018

May 17, 2018

May 21, 2018

---

[2] This would confirm the same user accessing Strike Lines and Smith's Facebook account.

39

May 22, 2018

May 31, 2018

(Accessed website one thousand six hundred ninety four (1,694) times)

The following IP addresses were located in the June logs as accessing the Strike Lines' website on the following dates:

██████████████

June 4, 2018

June 5, 2018

June 6, 2018

June 7, 2018

June 12, 2018

June 13, 2018

June 19, 2018

June 20, 2018

June 21, 2018

June 22, 2018

June 25, 2018

June 26, 2018

June 27, 2018

(Accessed website two thousand eight hundred forty nine (2,849) times)

    10.    On September 11, 2018, your Affiant received the subpoena response from Verizon Wireless. The subscriber information for phone number ██████████ which was known to be the suspect's and utilized during communications regarding the instant offense, is as follows:



11.    On September 12, 2018, a grand jury subpoena was served upon AT&T Internet Services regarding IP addresses, ███████████████ for the relevant time frame. These IP addresses were associated with Timothy Smith as being used to log into Smith's Facebook account <u>and</u> to log onto the Strike Lines' website during the time of the cyber intrusions.  On September 20, 2018, your Affiant received the subpoena response from AT&T via email. <u>The results for Internet Protocol (IP) address</u> ████████ <u>are as follows</u>:



<u>The results for IP address</u> ██████ <u>are as follows</u>:



41

AT&T identified this IP address as being part of a block of IPs sub-leased and assigned to a Direct Internet Access (DIA) or a Managed Internet Service (MIS) customer. Individual IP assignments within this block are controlled and managed by ███████████ It should be noted that Timothy Smith identified his place of employment on Facebook as ███████████, and stated that he is a Senior Software Engineer for the company. As such, your Affiant believes the suspect engaged in unauthorized access of the Strike Lines' website both from his premises and his place of employment – which is logical based upon images he sent wherein a laptop was utilized to engage in the illicit activity. Your Affiant knows, based upon training and experience, that most persons carry their laptops with them personally both to/from their residences and place of employment.

12.    Your Affiant learned that Timothy Smith, since the above noted illicit acts, separated from his personal relationship and thus left his 2619 Burlington Drive address. Specifically, on October 25, 2018, your Affiant observed that the home had a "For Sale" sign in the yard and only observed a white female present, identified as ███████████ who has a child in common with Timothy Smith. Your Affiant also observed a white Toyota Highlander bearing ███████████ at the residence, which is registered to ███████████ Based upon your Affiant's training and experience, as well as common sense, it is believed that when a person moves residences that he/she will bring his/her laptop to the new residence. As such, your Affiant began to conduct further surveillance in order to confirm the current residence of Timothy Smith so his electronic devices could be seized pursuant to the instant warrant.

13.    On October 26, 2018, at approximately 9:30 a.m., your Affiant observed Timothy Smith at **2507 Richard Avenue, Mobile, Alabama 36606**. Your Affiant not only observed Timothy Smith but also his white 2012 Ford F-350 ███████████. This Alabama

tag was also involved in an insurance claim in 2017 that related to Timothy Smith. On October 27, 2018, at approximately 5:30 a.m., your Affiant again observed Timothy Smith's ███████████ at **2507 Richard Avenue, Mobile, Alabama 36606**. On October 29, 2018, at approximately 6:00 a.m., your Affiant again observed Timothy Smith's ██████████ at **2507 Richard Avenue, Mobile, Alabama 36606**. On October 30, 2018, at approximately 6:00 a.m., your Affiant confirmed ████████████████████ at 2619 Burlington Drive East, Mobile, Alabama 36695. On the same date, at approximately 6:20 a.m., your Affiant observed Timothy Smith's █████████ **2507 Richard Avenue, Mobile, Alabama 36606**. On October 31, 2018, at approximately 6:00 a.m., your Affiant again observed Timothy Smith's ██████████ at **2507 Richard Avenue, Mobile, Alabama 36606**.

14.     Thus, your Affiant knows that Timothy Smith is currently residing at the subject premises after his separation from his relationship, and there is a fair probability that evidence of the instant crimes is present in his electronic devices based upon the aforementioned electronic investigation.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

1.      This application seeks permission to search and seize records that might be found on the subject premises, more particularly described in Attachment A, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.

2.      Based upon your Affiant's training and experience and information related to your Affiant by agents and others involved in the forensic examination of computers, your Affiant knows that computer data can be stored on a variety of systems and storage devices including hard

43

disk drives, USB flash or thumb drives, cellular telephones protected by biometrics/passwords, compact disks, magnetic tapes and memory chips. Your Affiant also knows that, during the search of the premises, it is not always possible to search computer equipment and storage devices.

3.      Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

4.      Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and even to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

5.      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte ("MB") of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte ("GB") of storage space, or 1,000 MB, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 GB of data are now commonplace in desktop computers. Consequently, each non-networked, desktop

44

computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would result in a stack of paper over four miles high.

6.     Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file, which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time may be necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

7.     Searching the electronic media for the evidence more particularly described in Attachment B may require a range of computer forensic analysis techniques.  This is so because criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information.  In order to properly execute the search authorized by the warrant, specially trained agents or forensic analysts may be required to conduct a thorough forensic analysis of the seized media, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, your Affiant requests permission to use whatever

45

computer forensic analysis techniques appear necessary to locate and retrieve the evidence as more particularly described in Attachment B.

8.      Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

    a) I know that when an individual uses a computer to obtain unauthorized access to a victim computer over the Internet, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium

46

for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

## **CONCLUSION**

Based on the forgoing, I request that the Court issue the proposed search warrant.

47

## REQUEST FOR SEALING

I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Stephanie Cassidy
Task Force Officer
Federal Bureau of Investigation

THE ABOVE AGENT HAS ATTESTED
TO THIS AFFIDAVIT PURSUANT TO
FED. R. CRIM. P. 4.1(b)(2)(B) THIS 14th
DAY OF NOVEMBER 2018

SONJA F. BIVINS
UNITED STATES MAGISTRATE JUDGE

48

## ATTACHMENT A

### Property to Be Searched

The residence located at **2507 Richard Avenue, Mobile, Alabama 36606** is described as a single-family home with brick and tan wood siding and a shingled roof with a chimney. The residence has two front facing windows with black shutters. The entrance to the residence is a dark colored wood and glass door on the east side of the home that opens in and to the right. The residence is located on a one (1) acre lot with a fenced in back yard, gravel drive way and small wooden porch on the east side of the home.  This warrant includes any/all vehicles on the subject premises or its curtilage.



## **ATTACHMENT B**

## **ITEMS TO BE SEIZED**

1.    All records relating to violations of Title 18, United States Code, Section 1030(a)(2)(C), those violations involving Timothy Jerome Smith, including any electronic evidence containing:

2.   Records and information relating to unauthorized access to the computer systems/website of Strike Lines LLC;

3.   Records and information relating to any/all access of Strike Lines LLC;

4.   Records and information relating to Strike Lines LLC and its website;

5.   Records and information relating to the Facebook account of Timothy Jerome Smith;

6.   Records and information relating to the identity or location of the suspect;

7.   Records and information relating to communications with Internet Protocol



8.   Records and information relating to malicious software;

9. Computers or storage media used as a means to commit the violation described above.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

2

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

n.  Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

3

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

4